NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1213

SOMERVILLE OFFICE ASSOCIATES LIMITED PARTNERSHIP

vs.

CRESSET DEVELOPMENT, LLC, & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Somerville Office Associates Limited Partnership (SOA) filed a complaint in the Superior Court against Cresset Development, LLC, and affiliate CDNV Land, LLC (Cresset), as well as BRE-BMR Middlesex LLC (BioMed).  The complaint alleged that the defendants owed a substantial "earnout" payment and raised five counts:  (1) breach of contract (Cresset); (2) breach of implied covenant of good faith and fair dealing (Cresset); (3) successor liability (BioMed); (4) violation of G. L. c. 93A (Cresset and BioMed); and (5) declaratory relief (Cresset and BioMed).  Cresset and BioMed moved to dismiss the claims, and a judge allowed the motions.  We affirm.

---

[1] CDNV Land, LLC, and BRE-BMR Middlesex LLC.

Background.  In October 2016, SOA owned 5-7 Middlesex Avenue in the Assembly Square neighborhood in the city of Somerville.  At that time, SOA and Cresset executed a letter of intent for the sale of the property for $80 million.  The parties then executed a purchase and sale agreement on January 17, 2017 (Original PSA).  Thereafter, the parties agreed to split the transaction into two staggered sales, reduce the purchase price to $65 million, and include an earnout provision in connection with potential future development.  Accordingly, on March 23, 2017, the parties executed two new purchase and sale agreements, one pertaining to an improved parcel containing an existing office building, which would be sold first for $35 million (Improved PSA), and the second pertaining to an unimproved parcel that would be sold later for $30 million (Unimproved PSA).

The Unimproved PSA contained an earnout provision with a formula for additional payments to SOA if building permits issued within a five-year period to construct commercial space that exceeded a certain square footage threshold.  SOA calculated the potential value of this earnout provision to be nearly $20 million based on March 2016 master plans (Original Master Plans) that it had previously commissioned and included in the sale to Cresset.  Although it retained discretion to revise and edit the Original Master Plans, Cresset agreed to

provide monthly updates to SOA and to pursue municipal approval of the Original Master Plans. Cresset purchased the improved parcel in January 2018.

One month after the sale, Cresset presented SOA with new master plans (Revised Master Plans). The Revised Master Plans changed the development plan for both the improved and unimproved parcels, reconfigured and redesigned the proposed buildings, and substantially reduced the potential earnout to just over $9 million. Despite the reduced earnout, SOA agreed to amend the Unimproved PSA to incorporate the Revised Master Plans. In June 2018, Cresset obtained municipal approval for the Revised Master Plans. Cresset purchased the unimproved parcel in January 2019.

Thereafter, Cresset ceased providing updates about the development to SOA for several months. In November 2019, Cresset unsuccessfully sought approval from SOA for a change in the earnout provision relative to buildings that straddled the improved and unimproved parcels. In the meantime, unbeknownst to SOA, Cresset and BioMed developed, in March 2020, yet another set of master plans (Final Master Plans) with an eye toward demolishing the existing building and centering most development on the improved parcel. In July 2020, municipal officials approved the Final Master Plans. In January 2021, BioMed purchased both the improved and unimproved parcels from Cresset

3

for nearly $200 million.  On May 21, 2021, Cresset and BioMed rejected SOA's demand for an earnout payment of more than $9 million and this civil action followed.

Cresset has conceded in its brief that while this appeal was pending, building permits issued for construction on the unimproved parcel.  Because, in its view, the issuance of the building permits triggered the earnout provision in the Unimproved PSA, Cresset reports that it paid SOA $385,230.

Discussion.  A motion to dismiss is properly allowed if a complaint "[f]ail[s] to state a claim upon which relief can be granted."  Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). We review the allowance of a motion to dismiss de novo, accept as true the allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor.  Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011).  When examining the claims, we look beyond the conclusory allegations in the complaint, examine the documents attached to the complaint, and focus on whether the factual allegations plausibly suggest an entitlement to relief.  Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008); Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000).

1.  Covenant of good faith and fair dealing.  The covenant of good faith and fair dealing provides that "neither party shall do anything which will have the effect of destroying or

4

injuring the right of the other party to receive the fruits of the contract."  Druker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976), quoting Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936).  The complaint alleged that Cresset breached its duty of good faith and fair dealing when it "abandoned" the project outlined in the 2018 Revised Master Plans in favor of the Final Master Plans crafted by Cresset and BioMed.  Based on the contractual provisions agreed on by SOA and Cresset as well as their alleged conduct, the complaint fails to plausibly suggest an entitlement to relief.

Contrary to SOA's contention, the complaint and attached documents do not state that Cresset breached any duty owed to SOA with respect to the Revised Master Plans.  When SOA and Cresset executed the Original PSA on January 17, 2017, they agreed that the master plans could be modified during two distinct time periods.  Section 6.2 allowed SOA to change the master plans under specified circumstances within forty-five days of executing the Original PSA.  At the expiration of that forty-five day period, the "sole right" to change the master plans shifted to Cresset under that same section.  Section 6.1 provided additional language giving Cresset "the sole right to determine what and when to develop" and the "sole discretion" to "change or withdraw" the master plans.  Cresset and SOA agreed

5

that these rights would survive the closing.  This broad power granted to Cresset continued to be included in the Unimproved PSA executed on May 23, 2017, and survived the closing.  The conduct of the parties also suggested an understanding that the master plans were never cast in concrete.  As the complaint alleges, prior to the closing, SOA and Cresset agreed in 2018 to scrap the Original Master Plans in favor of the Revised Master Plans.  This significant change to the Original Master Plans included both the improved and unimproved parcels and provided for new buildings to straddle both parcels.

Thus, the complaint and supporting documents fail to support SOA's contention that the master plans cabined Cresset's business options and required Cresset (investing at least $65 million) to adhere to the Revised Master Plans come what may. When Cresset created the Final Master Plans, it did so according to a contractual right to exercise its "sole discretion" to determine the scope of the development according to master plans of its own choosing.  "If the words of a contract are clear, they are dispositive as to the meaning of the contract." Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 581–582 (2024).  Even if the Final Master Plans diminished the value of SOA's earnout, the allegations of SOA's complaint do not support an inference that Cresset failed to "remain faithful to the intended and agreed expectations of the parties" as

6

documented. <u>Uno Restaurants, Inc</u>. v. <u>Boston Kenmore Realty Corp</u>., 441 Mass. 376, 385 (2004).

SOA contends that Cresset's broad discretion with respect to modifying the master plans was limited to addressing municipal concerns in the permitting process and terminated on Cresset's purchase of the unimproved parcel. There is nothing, however, in the language of the Original PSA or the Unimproved PSA, or any other document, that supports this contention. Because SOA and Cresset did not include such language in their various agreements, we are not at liberty to impose it on them now. See <u>Ayash</u> v. <u>Dana-Farber Cancer Inst</u>., 443 Mass. 367, 385 (2005) ("[t]he scope of the covenant is only as broad as the contract that governs the particular relationship"). "It is not the role of the court to alter the parties' agreement." <u>Rogaris</u> v. <u>Albert</u>, 431 Mass. 833, 835 (2000).

2. <u>Application of the earnout provision</u>. Failure to pay money owed under the earnout provision could constitute a breach of contract, but the complaint must indicate the earnout was due and left unpaid. The complaint alleges that the earnout provision applied to both parcels and was not paid according to the Final Master Plans. Resolution of this claim turns on whether the earnout applied to both parcels. Once again, neither the complaint nor the attached documents support SOA's claim.

7

The complaint does not show that Cresset breached the earnout provision because the supporting documents show the earnout provision applied only to the unimproved parcel. "[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose." Anderson St. Assocs. v. Boston, 442 Mass. 812, 819 (2004). Here, SOA and Cresset split the transaction into the Improved PSA and the Unimproved PSA on May 23, 2017, and included the earnout provision only in the Unimproved PSA. "In interpreting a written contract, such as a purchase and sale agreement, the court gives full effect to all the terms expressed by the parties." Rogaris, 431 Mass. at 835. By including the earnout provision in the Unimproved PSA and excluding the earnout provision in the Improved PSA, Cresset and SOA expressed a clear intent that the earnout would be limited to the unimproved parcel.

On appeal, SOA contends that the earnout provision, though contained only in the Unimproved PSA, implicitly references both the improved parcel and the unimproved parcel. While there is no explicit reference to the improved parcel in the Unimproved PSA, SOA argues that the various definitions and uses of the terms "Property," "Land," "Project," and "on the Property" throughout the agreements lead to the "inescapable conclusion"

8

that the earnout provision applies to both the unimproved and improved parcels. We disagree.

SOA's interpretation, which would require reading "on the Property" in the earnout provision to refer to something other than real property, is not a reasonable one and cannot be squared with the contractual language. Furthermore, beyond the absence of any reference to the earnout provision in the Improved PSA, we note that SOA, a sophisticated business organization represented by counsel, missed a significant opportunity to expressly include a reference to the improved parcel in an amended earnout provision. This opportunity arose after Cresset purchased the improved parcel. At that point, Cresset and SOA agreed to the Revised Master Plans and executed an amendment to the Unimproved PSA. In that amendment, the terms of the earnout were modified, but no language linked the earnout to the improved parcel. To the contrary, the amendment referenced the "unimproved real property" and required a notice of earnout to be recorded "just following the recording and filing of the Deed for the Land" -- a clear reference to the unimproved parcel that had not yet been conveyed. We also note that the notice of earnout was recorded immediately following the recording of the deed to the unimproved land. Especially after the Revised Master Plans resulted in structures straddling both parcels, SOA could have struck a more advantageous deal

that expressly extended the earnout to the improved parcel, but it did not do so.  As previously discussed, we cannot, in hindsight, alter the parties' agreement.  <u>Rogaris</u>, 431 Mass. at 835.

3.  <u>Other claims</u>.  Finally, we discern no basis for successor liability, a 93A cause of action, or declaratory relief.  These claims are based on the same set of alleged facts

and fail under the same analysis.  See <u>Iannacchino</u>, 451 Mass. at 635.

<u>Judgment affirmed</u>.

By the Court (Shin, Brennan &
  Hodgens, JJ.[2]),

Assistant Clerk

Entered:  May 29, 2024.

---

[2] The panelists are listed in order of seniority.